UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| EDWARD LEE KIMBROUGH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-1053 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm. For the reasons set forth below, Plaintiff's Motion for Summary Reversal [18] is GRANTED, and the Commissioner's Motion to Affirm [21] is DENIED.

### BACKGROUND

Plaintiff, Edward Kimbrough ("Kimbrough"), was 47 years' old at the time of his administrative hearing. (R24) He is 5'10" and weighs around 160 pounds. (R629) Kimbrough is single and lives alone. (R24) He has a GED and has worked as a personal attendant caring for an elderly relative, machine helper, and cook. Id.

Kimbrough was diagnosed with AIDS in April 2007. (R253) He was tested after developing four MRSA infections requiring IV antibiotic treatment between November 2006 and April 2007. He was prescribed Effexor for depression in March 2006 and gets headaches as a result of high blood

pressure 2-3 times per month. (R435, 653) He has asthma and uses his inhaler 3-4 times a week. (R652-53) He suffers from panic attacks 3-4 times a year. (R657) Kimbrough stated that he has become increasingly tired, is in and out of the bathroom with diarrhea, gets short of breath and fatigued, and had not noticed improvement from his HIV medications. He walks with the assistance of a cane because his right leg sometimes gives out and can stand for about 30-40 minutes before needing to sit down. (R654-55) Kimbrough estimates that he is able to lift 15 pounds, and sometimes requires that a new task be explained to him 2-3 times before he understands. (R656)

On an average day, Kimbrough gets up and has something to eat around 8:30 or 9:00 am. (R648) He makes his bed and takes a shower, but then needs to rest for a few minutes before getting dressed. Id. He lives by himself and takes care of his own needs of everyday living, like personal hygiene, grocery shopping, cooking, housekeeping, and taking out the garbage. (R648-49) Kimbrough sometimes drives a car, and when the weather permits, he will go check on his mom and stepfather. (R630, 649) He also takes a nap or lies down every day; the combination of his medications and not being able to sleep during the night make him tired. (R656) He enjoys reading a book, working a puzzle, or walking for about a half hour and attends church 3-4 times a year. (R649-50, 652) Kimbrough goes to barbeques with friends, but doesn't like crowds. (R651) He drinks beer maybe a couple of times a week, averaging 4-6 beers per week (R644-46)

On May 21, 2007, he applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging disability that began on November 1, 2006. (R16) His application was denied both initially and on reconsideration. Id. Kimbrough requested a hearing before an administrative law judge ("ALJ"). A hearing was held before ALJ John M. Wood on September 16, 2009, during which Kimbrough testified and was represented by counsel.

Vocational Expert ("VE") Mr. Fisher was present at the hearing and was asked the following hypothetical by the ALJ:

> Q. Assume the past work same as the claimant's exertional capacity, limited to light work with no climbing of ladders, ropes, or scaffolds. Other postural functions could be performed occasionally, all manipulative functions can be performed frequently. A need to avoid hazards and also a need to avoid concentrated exposure to pulmonary irritants, extreme temperatures and humidity. And also a limitation to perform in simple and repetitive tasks. Would I be correct in concluding that those restrictions would preclude a return to any past work?
>
> A. Yes.
>
> Q. Okay. And if you could now add the vocational factors by assuming that the hypothetical individual is of the claimant's age and education and work history. In your opinion would there be a number of jobs in the national and/or regional economy that such a person could perform? We should clarify first there'd be no transferability of skills with that hypothetical, correct? With given the simple and repetitive limitation there'd be no transferability of skills, correct?
>
> A. No. The only transferable would be to some kitchen . . .
>
> Q. Again if someone was limited to the performance of simple and repetitive tasks?
>
> A. Well, no.
>
> Q. Right. So now are there any, is there unskilled work that could be performed?
>
> A. Yes. Cutter, paster, press clippings, 249.587-014, and documents preparer, microfilm, 249.587-018, I'm sorry, you said light work. We'll start at office machine operators except computers. Photocopy machine operators, 207.685-014 and photographic machine operator, 207.685-018 that combine 1,466. Under cashiers, cashier II, eliminating gambling and toll booth cashiers a total of 41, 050 employment. <u>DOT</u>, I'm sorry, I didn't give you that, 211.462-014. Routing under a shipping/receiving and traffic clerks, routing clerk, 222.687-022, there is also included in that occupational classification car checker which is a train freight occupation, a nominal number.

But total, combined employment in that occupational classification is 3,990 and I would say 3,900 are in the routing clerk job.

Q. Okay. And are those representative positions?

A. They are.

Q. And do they follow the national population trends?

A. They do.

Q. If someone had to alternate sitting and standing so by the end of the day in terms of the sitting and standing requirements they were sitting half the time and standing half the time, would, how would the occupational base you've identified be effected?

A. It would not.

Q. There'd be no effect you say?

A. There would not be an effect, sir.

Q. Okay. If someone were limited to only occasional interaction with the public, coworkers and supervisors, I assume that would knock out the cashier job, right?

A. Yes.

Q. Would the other jobs be preserved?

A. I believe so, yes, sir, it would.

Q. And with respect to these positions we've talked about how many absences per month would an employer typically tolerate from an employee and have them keep their job?

A. One per month.

Q. And is your testimony consistent with the DOT?

A. Yes.

ALJ. Counsel?

ATTY.  If the person had to take frequent breaks, say more than for within a workday, how would that be tolerated?

ALJ.  Well, let's define first . . .

ATTY.  Okay.

ALJ.  - - the what [sic] referred to as scheduled breaks.  Let's go through that briefly to set the stage for that.

Q.  Let – Mr. Fisher, is it correct that all the jobs you cited today adhere to a normal work structure whereby you work for a couple hours and get about a 10 or 15-minute break, work for a couple of hours, get about a half-hour or so break for lunch, work for a couple hours, get a 10 to 15-minute break, work for a couple hours and you're done.  Is that pretty much - -

A.  Yeah.

Q.  Okay.  So the breaks I referred to would be referred to as scheduled breaks.

A.  Yeah.

Q.  So obviously everybody gets those.  Would there be any, in terms of competitive employment now, not something that deals with accommodations for a particular individual.  But just anybody doing this job, be any of these jobs on their own would there be any flexibility for, in terms of any breaks beyond the, the scheduled breaks?

A.  There would be but I think the, the hypothetical would reduce the base significantly.

Q.  Okay.  Well, let's quantify I guess is what I'm getting at and then, Counsel, you can pick up from here.  But what would be the amount of unscheduled breaks on top of the scheduled breaks that one could take during the course of a day and still be able to maintain employment?

A.  In your original definition I think you said two hours followed by a 15-minute break, two hours followed by a lunch and two hours followed by a break and the two hours and you're done.

Q. Right.

A. If you broke that down I think into one-hour a seven-minute break, another hour an eight-hour an eight-minute break and so on, I, I think you would find that there would be again an impact on the base. Unskilled workers are not - - I mean it's aa relatively structured, employers don't have a lot of tolerance for that.

Q. Right. So I'm trying to get where you, at what point does - -

A. I think that it, the characterization I made would significantly reduce the base in other words.

Q. I don't understand. So you mean in addition to scheduled breaks you're, what your characterizing if within those four two-hour work segments you took a break, within each segment for five minutes or so, then that would eventually eliminate all employment?

A. Yes.

Q. Okay. How about something short of that? What, at what point do you get to the point where, where a unscheduled break taken every day would eliminate all jobs?

A. I think if you added more than one additional break per day - -

Q. Okay.

A. - - then you're looking at - -

Q. Okay, So you can have one unscheduled break of like five minutes a day on top of the scheduled breaks and you're good - -

A. If you - -

Q. - - but anything beyond that, no?

A. Right. If you said to your employer - - to your supervisor I need to go to the bathroom and that happened twice a day in addition to your regular scheduled breaks, I think that would impact your employment.

Q. Okay. And none of these jobs allow for any flexibility with regard to when you take your scheduled break time? In other words

> you can't flex out and say rather than a 15-minute break I'll take a five-minute break here and a 10-minute break here. You can't do that in any of these jobs?
>
> A.  I think that would be an accommodation by your, by your employer.
>
> Q.  Okay.
>
> A.  Most of these jobs are done, there might be only one employer or employee doing the job you were doing.
>
> Q.  Okay.
>
> A.  So there would have to be an accommodation to provide that.

(R661-67)

On December 8, 2009, the ALJ issued his decision. (R16-26) The ALJ found that Kimbrough has the following severe impairments: COPD, asthma, hypertension, HIV, depression, and posttraumatic stress disorder. (R18) The ALJ determined, however, that Kimbrough does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR Part 404, Subpart P, Appendix 1. (R19)

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Kimbrough retained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he cannot climb ladders, ropes, or scaffolds,; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; he can perform all manipulative functions frequently; he must avoid hazards; he must avoid concentrated exposure to pulmonary irritants, extreme temperatures, and humidity; and he is limited to simple and repetitive tasks. (R20) The ALJ concluded that while Kimbrough's medically determinable impairments could reasonably be expected to produce symptoms, his assertions

regarding the intensity, persistence, and limiting effects of the symptoms were found to be not credible to the extent that they are inconsistent with the RFC assessment. (R23)

Past relevant work was found to be precluded, and given Kimbrough's age, education, work experience, and RFC, the ALJ determined that there are a significant number of jobs in the national economy that he could perform. (R24-25) Based on a consideration of his age, education, work experience, and residual functional capacity, the ALJ concluded that Kimbrough was not under a disability as defined under the Social Security Act at any time since his alleged onset in November 2006. (R25)

Kimbrough submitted a Request for Review of Hearing Decision, and the Appeals Council subsequently declined review of his claim, making the ALJ's decision the final decision of the Commissioner. (R1-5) This appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to SSI and/or DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any

substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91

S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); <u>Imani v. Heckler</u>, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Kimbrough raises essentially four claims: (1) the ALJ did not properly evaluate his impairments under Listing 14.08 for HIV Infection; (2) the ALJ did not properly consider the opinion of his therapist; (3) the ALJ did not properly account for his limitations in concentration, persistence, or pace; and (4) the ALJ did not properly evaluate the credibility of his allegations.. As the Court finds the first argument to require a remand of this action, the remaining arguments need not be addressed.

Kimbrough argues that the ALJ did not properly evaluate impairments resulting from his HIV infection under Listing 14.08. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." <u>Barnett v. Barnhart</u>, 381 F.3d 664, 668 (7th Cir. 2004); <u>Cirelli v. Astrue</u>, 751 F.Supp.2d 991, 1002-03 (N.D.Ill. 2010). Whether an impairment equals a listing "is a medical judgment, and an ALJ must consider an expert's opinion on the issue." <u>Id.</u>, at 670. Moreover, "[a]n ALJ is required to 'meaningfully discuss why a claimant does not medically meet a Listing and failure to engage in such an analysis is grounds for reversal.'" <u>Ribaudo v. Barnhart</u>, 438 F.3d 580, 584 (7th Cir. 2006).

Kimbrough has pointed to medical evidence in the record that could possibly support a finding that his condition meets or equals a listing. The ALJ's entire discussion on this point consists of the lone sentence, "The claimant's HIV does not meet or equal Listing 14.08, human immunodeficiency virus (HIV) infection." Period. The ALJ did not discuss any subsection or

criteria of the Listing nor any of the medical evidence supporting his conclusion and is devoid of any analysis of the evidence identified by Kimbrough that would permit meaningful judicial review. A similar analysis was found to be insufficient in Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003), where the Seventh Circuit noted that the failure to discuss a listing, "combined with an otherwise perfunctory analysis, may require a remand." *See also*, Button v. Astrue, 2012 WL 3096690, at *7 (N.D.Ill. July 30, 2012) (finding the one sentence assertion that a claimant did not satisfy a listing with no stated rationale or discussion to support that conclusion to be insufficient.)

> The omission of any discussion of [the claimant's] impairments in conjunction with the listings frustrates any attempt at judicial review . . . . Such a lack of reasoning prevents us from applying the decision structure undergirding disability determinations to a substantive analysis of [the claimant's] impairments.

Id.; Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002).

The Commissioner argues that there was sufficient medical evidence in the record to support the ALJ's conclusion that Listing 14.08 was not satisfied. While it may sometimes be appropriate to scour the record in the case in order to build a better bridge than that built by the ALJ, that is not the case here. As stated so eloquently in Button:

> [The Court] decline[s] to speculate what the ALJ would have said had he actually memorialized the analysis of the record evidence that the Commissioner argues it is possible that he engaged in here. The evidence discussed by the parties in their briefs is sufficiently nuanced and disputed that the Court cannot, and should not, engage in the close analysis of that evidence that, in the end, may or may not support the ALJ's summary conclusion that Claimant's condition does not meet or equal a specified listing.

Id. The Court therefore concludes that the Commissioner's post hoc rationalizations, however persuasively presented, cannot rehabilitate the ALJ's perfunctory, one sentence dismissal of Listing

14.08, as it is "the ALJ (not the Commissioner's lawyers) [who] must build an accurate and logical bridge from the evidence to [his] conclusions." Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [18] is GRANTED, and the Commissioner's Motion to Affirm [21] is DENIED. This matter is now REVERSED and REMANDED to the Commissioner for new hearing to correct the above discussed deficiency pursuant to sentence four of 42 U.S.C. § 405(g), which authorizes the Court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This matter is now terminated.

ENTERED this 21st day of February, 2013.


s/ James E. Shadid
James E. Shadid
Chief United States District Judge